**UNITED STATES of America, Appellee,**

v.

**Martin H. NEFF, Appellant.**

**No. 72-1706.**

United States Court of Appeals, Third Circuit.

Argued Nov. 28, 1972.

Decided March 13, 1973.

Certiorari Denied June 18, 1973.

See 93 S.Ct. 3007.

Fred T. Cadmus, III, Cadmus, Good & Patten, West Chester, Pa., for appellant.

Robert E. J. Curran, U. S. Atty., John T. Thorn, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before McLAUGHLIN, ALDISERT and ADAMS, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM:

Appellant Neff was convicted on five counts of selling and delivering various quantities of stimulant and depressant drugs in violation of § 301(q)(2) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331(q)(2).

■ The first and apparently principal contention on behalf of Neff is the admission of testimony concerning "hippie type" persons, observed at or near the back door of Neff's office.

The defense attorney makes the brash statement that members of the trial jury would automatically associate "hippie type" with drug users. There is no justification for that statement in the entire trial record; nor was there any effort on the part of the attorney to document his insult to the integrity of the jury. Entrapment was also claimed for appellant on the spurious theory that drugs purchased from appellant by the undercover federal agents were the sole, isolated instances where Neff dispensed controlled drugs unlawfully. Actually Neff in making illegal drug sales, in some instances to people who turned out to be upholding the law, of itself did not support the entrapment charge. However, to rebut the erroneous, haphazard statement that the Government investigators were the only such buyers from Neff, evidence was introduced outlining a similar pattern and course of conduct by Neff in the past. The trial minutes indicate plainly that the prosecution was wholly concerned with the then activities of the people around the Neff office and not with their style of dress, hair, etc. It is very clear that the deliberate attempt to have appellant absolved from his conviction because among the people, in and out the Neff office back door, were some of the present younger generation. Those youngsters were just as much entitled to protection from Neff and his dangerous prohibited drugs as any other poor soul around the Neff place. They were also subject to the same palpable temptation of trying the available narcotics. The latter were being wrongfully sold by a physician, Neff who, above all other human beings, knew the awful, probable results of the misuse of those drugs, and who was directly commanded by law not to dispense them to anyone except for proper use in medical treatment. We find no error by the trial court in describing some of the younger generation who were around the Neff office at the time above mentioned.

■ The character evidence offered by the Government is attacked by the defense as having been wrongfully allowed by the district judge, particularly that given by Mr. Hoover, the principal of Unionville High School, and Mrs. Rice, who during the critical period was a student at the High School. Mr. Hoover was very much concerned regarding

his students using drugs of the prohibited kind. Mr. Hoover talked with a number of his pupils regarding the situation and the responsibility for it. He was an impressive witness. He knew of Neff and his reputation among the community and the persons making up at least one of the circles which Neff frequented.

Mrs. Rice was also an important witness who had talked with other students during the local critical drug abuse stage and was familiar with what the people of the area thought of Neff. The defense would have all of the testimony of those knowledgeable witnesses thrown out because Mr. Hoover and Mrs. Rice did not know Neff personally. However, they both knew what was going on and who was to blame. The defense argues that the alluded-to witnesses had no standing under the opinion in the United States Supreme Court in Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). In that decision upon which the defense depends so much, the same factual problem arose. At page 480, 69 S.Ct. at 221 the Court held that "both the propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle considerations difficult to detect and appraise from a cold record, and *only on a clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject.*" (Emphasis supplied).

What we have before us is a straightforward, truthful narration of an arrogant misuse of prohibited drugs from a source relied upon, particularly by simple, decent people with the courage to tell of the unbelievable menace that had struck their quiet community from a source they had been taught to trust always. In allowing the testimony of Mr. Hoover and Mrs. Rice there was no abuse of discretion by the district court. We hold that under the Michelson decision and the facts before us the ruling of the trial judge was just and right and should not be disturbed.

There is one more assertion by the defense which claims again that appellant was the victim of prejudicial error. The foreman of the jury told the judge that a character witness for appellant was known to him, the juror. The latter, foreman of the jury in this trial, was worried as to whether he should take part in the trial. The judge listened to him to see if he needed instructions and decided he did not. The juror did continue in the trial. All the law pointed to by counsel for defendant is based on giving instructions to a juror where both sides were not present. In this juror's difficulty there were no instructions needed, and the juror remained as the jury foreman. The judge here had merely taken care of this administrative matter immediately. As is seen there was no prejudicial abuse of discretion. It was purely a proper Michelson decision. The jury foreman conscientiously advised the judge that he knew one of the persons who appeared as a character witness for Neff. The judge, confident of the juror's integrity, rightfully considered that there was no necessity of instructions regarding the juror, who continued in the trial. Appellant cites United States v. Woodner, 317 F.2d 649 (2 Cir. 1963) which actually ruled, regarding administrative duties, as to whether a juror is qualified to sit or not especially where there is no showing of prejudice. There, as here, the conclusion by the trial judge was found not to be erroneous. In Bacino v. United States, 316 F.2d 11 (10 Cir. 1963) the court held that interviewing a juror by the trial judge in the absence of defendant and counsel, was not reversible error where the interview was limited in scope and the judge admonished the juror to refrain from discussing the case. In the instant litigation, the interview was extremely limited in scope and there was no reason for discussing the merits of the appeal. As Woodner, 317 F.2d page 652, noted, "We have enough confidence in the integrity and fairness of the District Judges to

assume that they will not make unfair remarks to jurors while undertaking administrative duties of this nature."

The judgment of the district court will be affirmed. Judge Adams concurs in the result.

ALDISERT, Circuit Judge (dissenting).

I am in essential agreement with the court's analysis of appellant's contentions except for the allegation of prejudicial error emanating from the trial court's *in camera* colloquy with the jury foreman. I am not satisfied that adequate safeguards inhered in that proceeding to insure that appellant received a unanimous jury verdict based solely upon the law and the evidence presented in the courtroom.

I find two serious deficiencies in the brief discussion that transpired in the judge's chambers.[1] First, I am not satisfied that the juror ever retreated from the doubt he expressed about his inability to return an impartial verdict. When the juror confessed concern as to whether his familiarity with the character witness "would affect [his] thinking," stating, "I don't know. I would try not to let it, but—," he was interrupted by the trial judge who concluded: "I am sure it would not." When the juror persisted in expressing concern, the judge intruded again with a statement of the judge's personal confidence in him, described by the juror as "more confidence in me than I have in myself."

Moreover, I am unable to characterize this interview as a purely administrative

---

1. THE COURT: The gentleman, who is No. 1 juror, has raised his hand, and we will stand in recess in order to determine what his inquiry may be of me.

Ladies and gentlemen of the jury, I do not think this will take very long. You are welcome to remain in your seats or to go into the jury room.

(Recess 1:52 P.M.)

(In Room 2112:)

THE COURT: What is your question, sir?

JUROR NO. 1: Well, I have been personally acquainted with and I have had business dealings with Mr. Shoemaker [a character witness] in Downingtown for eight to ten years now.

In my company at Lukens Steel Company we have a musical organization called the Lukens Steel Band of which I am business manager and have been for approximately 16 years. We played concerts in the summer months in surrounding communities. One of them is Downingtown. The Mayor and I have dealt with this business of contracts and money, and so forth, for this amount of time.

I am just not sure when you—your are going to ask me now, would this affect my thinking? I don't know. I would try not to let it, but—

THE COURT: I am sure it would not. I have perfect confidence in you, sir, that you will listen, as you are sworn to do, to the testimony and that you will accept the charge of the Court as controlling the reception of evidence, and I have complete confidence that you will be completely fair and impartial.

JUROR NO. 1: You have more confidence in me than I have in myself.

THE COURT: No, seriously; we are free-born Americans—

JUROR NO. 1: Yes.

THE COURT: —and I have great confidence in the jury system, and you have a duty to perform under your oath, and I have every confidence that you will fulfill it.

JUROR NO. 1: Well, other trials I have been on they wanted to know if anybody knew the witnesses, and so forth, and I—

THE COURT: You have been sworn and your instructions are to abide by the charge of the Court, and I am confident that you will do so.

JUROR NO. 1: O.K. Thank you.

THE COURT: We will return to the courtroom.

(In open court at 1:55 P.M.)

THE COURT: You may proceed, Mr. Cadmus.

MR. CADMUS: May we approach the bench a moment, Your Honor?

THE COURT: Yes.

(At side bar:)

MR. CADMUS: If Your Honor please, I must note an objection to the Court's conference with Juror No. 1 in the absence of counsel.

THE COURT: Very well. It is noted.

MR. CADMUS: Thank you, sir.

(End at side bar.)

obligation of the court. Both counsel should have been offered the opportunity to be present so they could have either addressed questions to the juror or have suggested inquiries to the court as to the juror's ability to return a verdict in accordance with the juror's oath.

While there may be occasions when a trial judge is privileged to communicate with the jury or a member thereof without affording counsel the opportunity to be present, I am not persuaded that it is ever appropriate during a trial where there is an expression by a juror which is equivalent to a declaration that he may be unable to return a verdict in accordance with the evidence and the law.

I would reverse and remand for a new trial.